# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

ASHLEY FAMIGLIETTA,

      Plaintiff,

v.                                                              No. CIV 12-824 LFG/ACT

K-BEAR, LLC d/b/a PROCUTS,
and JOHN and JANE DOES 1-5,

      Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Defendant K-Bear, LLC d/b/a ProCuts's ("ProCuts")

Motion for Summary Judgment [Doc. 39] and its Motion to Strike and/or Disregard Evidence [Doc.

43]. Both motions are fully briefed. [Docs. 39, 42, 44, 45; 43, 48, 49, 50.] After careful

consideration of the pertinent law, pleadings, and exhibits, the Court grants, in part, ProCuts's

motion to strike Plaintiff's June 2013 affidavit [Doc. 43] and grants ProCuts's summary judgment

motion [Doc. 39], with the result that Plaintiff Ashley Famiglietta's ("Famiglietta") Complaint

against Defendants is dismissed, with prejudice.

## Background

On June 26, 2012, Famiglietta filed a Complaint for Discrimination in the Thirteenth Judicial

District Court in Sandoval County, New Mexico, alleging violations of the New Mexico Human

Rights Act and Title VII of the Civil Rights Act of 1964, along with tort claims of retaliatory

discharge and intentional infliction of emotional distress. [Doc. 1, Ex. A; Doc. 9.] On July 27, 2012,

ProCuts removed this lawsuit to federal court. [Doc. 1.]

Famiglietta contends that ProCuts, a hair stylist business in Rio Rancho, New Mexico, discriminated against her on the basis of her pregnancy. [Doc. 1, Ex. A; Doc. 9, at 1.] Famiglietta was employed by ProCuts as a stylist from November 2009[1] to March 8, 2011. [Doc. 1, Ex. A, at ¶ 5.] She informed ProCuts in December 2010 that she was pregnant. [Id., at ¶ 6.] Subsequent to providing this information to her employer, she claims that ProCuts's employees and management began to harass her based on her pregnancy. [Doc. 9, at 3.] On March 8, 2011, ProCuts terminated Famiglietta's employment. [Doc. 9.] As a result of ProCuts's alleged wrongful conduct, Famiglietta seeks an award of damages for "all past, present, and future medical treatment costs; past, present and future pain and suffering; compensatory and special damages . . .; and property damages . . . ." [Doc. 1, Ex. A, at 9.]

ProCuts denies Famiglietta's allegations of wrongdoing and contends that in the fall of 2010, Famiglietta's performance began to decline and that it received complaints about her attitude and quality of work.  According to ProCuts, Famiglietta's pregnancy played no part in the termination decision. [Doc. 9, at 4-5.] Instead, ProCuts asserts that it terminated Famiglietta's employment for legitimate, non-discriminatory business reasons.

## Motion for Summary Judgment

I.      SUMMARY JUDGMENT LEGAL STANDARD

Summary judgment provides courts with a means by which "factually insufficient claims or defenses can be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources."  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

---

[1]Plaintiff's Complaint alleged that she started with ProCuts in November 2010 rather than November 2009. [Doc. 1-1, at ¶ 5.] However, later pleadings, including Famiglietta's deposition testimony indicate she started working for ProCuts in November 2009. [Doc. 39-5, at 23-24.]

Rule 56(a) requires the court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2012). The party seeking summary judgment has an initial burden to show that there is an absence of evidence to support the non-moving party's case. *See* Kannady v. City of Kiowa, 590 F.3d 1161, 1168-1169 (10th Cir. 2010) ("moving party has both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.") (internal quotation marks removed). Upon meeting that burden, the non-moving party must "identify specific facts that show the existence of a genuine issue of material fact." Id.

If "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" The non-moving party may not rest upon mere allegations or denials. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (*quoting* the pre–2010 version of Rule 56(e)). *See also* Nahno-Lopez v. Houser, 625 F.3d 1279, 1283 (10th Cir. 2010) ("in response to a properly supported motion for summary judgment, a non-movant must produce sufficient evidence for a reasonable trier of fact to find in its favor at trial on the claim or defense under consideration").

The Court observes that the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48. Stated differently, " 'the movant need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" Kannady, 590 F.3d at 1169 (citation omitted). *See also* Celotex, 477 U.S. at 323 (Rule 56 standard requires the court to enter summary

judgment "against a party who fails to make a showing sufficient to establish the existence of an

element to prove that party's case, and on which that party will bear the burden of proof at trial.")

As recently explained by the federal Utah District Court, in <u>Wilcox v. Career Step, LLC</u>, __

F. Supp. 2d __, 2013 WL 839936, *4 (D. Utah Mar. 6, 2013),

> . . . now as before the 2010 amendments to Rule 56, the court must
> perform "the threshold inquiry of determining whether there is the
> need for a trial—whether, in other words, there are any genuine
> factual issues that properly can be resolved only by a finder of fact
> because they may reasonably be resolved in favor of either party."
> <u>Anderson</u>, 477 U.S. at 250. "When applying this standard, we
> examine the factual record in the light most favorable to the party
> opposing summary judgment." <u>Kannady</u>, 590 F.3d at 1168 (*quoting*
> <u>Belhomme v. Widnall</u>, 127 F.3d 1214, 1216 (10th Cir. 1997)).

Thus, while the Court examines the factual record in the light most favorable to Plaintiff, "mere

assertions, conjecture, or the existence of a scintilla of evidence in support of her position, are not

sufficient to show a genuine issue of material fact." <u>Carpenter v. Boeing Co.</u>, 456 F.3d 1183, 1192

(10th Cir. 2006) (citations and quotations omitted).

## II.   PRELIMINARY MATTERS

### A.   Motion to Strike

The Court sets out *infra* the undisputed material facts ("UMF") that are supported by

affidavits, deposition testimony and other admissible evidence. [Doc. 39, Exs. 1-30.]   While

Famiglietta attempts to contradict some of ProCuts's proposed UMFs, she primarily relies on her

own affidavit testimony that conflicts with earlier sworn deposition testimony or other admissible

evidence.  [Doc. 42, Ex. 1, Ashley Famiglietta Aff.]  This is impermissible.  *See* <u>Franks v. Nimmo</u>,

796 F.2d 1230, 1237 (10th Cir. 1986) (stating "courts will disregard a contrary affidavit when they

conclude that it constitutes an attempt to create a sham fact issue").  *See also* <u>See Law Co., Inc. v.</u>

<u>Mohawk Constr. & Supply Co., Inc.</u>, 577 F.3d 1164, 1169 (10th Cir. 2009) (to be disregarded as a

sham, affidavit must conflict with earlier sworn testimony).  In <u>Franks</u>, the Tenth Circuit observed that "the utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony." <u>Franks</u>, 796 F.2d at 1237.

In determining the existence of possible sham fact issues, the court considers "whether: "(1) the affiant was cross-examined during [her] earlier testimony; (2) the affiant had access to the pertinent evidence at the time of [her] earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain." <u>Ralston v. Smith & Nephew Richards, Inc.</u>, 275 F.3d 965, 973 (10th Cir. 2001) (quotation omitted).

The Tenth Circuit explicitly requires that a district court first "determine whether the conflicting affidavit is simply an attempt to create a 'sham fact issue'" before disregarding it or excluding it from summary judgment consideration.  <u>Law Co., Inc.</u>, 577 F.3d at 1169 (internal citations omitted).  Failure to do so constitutes abuse of discretion.  <u>Id.</u>  In other words, before striking or disregarding an affidavit, the Court must expressly determine if the affidavit conflicts with prior sworn testimony.  <u>Id.</u> at 1169-70.  In addition, the Court is mindful that in determining whether an affidavit was used to create a sham factual issue, a key inquiry is "whether the earlier testimony reflects confusion which the affidavit attempts to explain." <u>Franks</u>, 796 F.2d at 1237. If the later affidavit merely explains some sort of confusion in the earlier testimony, the affidavit is not necessarily disregarded.

Here, ProCuts's motion to strike [Doc. 43] identifies a number of conflicts between Famiglietta's 42-paragraph affidavit attached to her response to the summary judgment motion [Doc. 42-1] and her earlier deposition testimony.  Famiglietta was deposed on December 6, 2012

[Doc. 39-5], and signed her affidavit on June 4, 2013, the day before she responded to the summary judgment motion.[2]  Most of the paragraphs in her affidavit specifically identify ProCuts's proposed UMFs by number in an attempt to create disputed facts.

The Court discusses some of the conflicts as follows.  The conflicts in sworn testimony are significant in that they relate to disciplinary action taken by ProCuts, complaints about Famiglietta's job performance, or complaints about her attitude at work.  Thus, such conflicts concern the purported business-related reasons for the termination decision.

In Famiglietta's December 2012 deposition, defense counsel inquired about a note Famiglietta wrote on May 20, 2010 relating to a haircut she gave a little girl.  Counsel asked: "And this [the note] is relating to an incident with a haircut that you did and you, looks like, poked – slipped with your scissors and poked the corner of the little girl's eye, something like that?" Famiglietta responded: "Yes, ma'am."  She further testified that she remembered that. [Doc. 39-5, at 140.] In the June 2013 affidavit, Famiglietta stated: "At no time did I ever poke a child in the eye with scissors . . . " as set forth by ProCuts in its UMFs.  [Doc. 42-1, at ¶ 4.] No matter how Famiglietta attempts to harmonize the conflicting testimony (*e.g.,* "she was making a reference to the area in which the scissors [sic] scratch occurred;" "the scissors slipped and scratched the side of the girls [sic] face, near the corner of her eye") [Doc. 48, at 3; Ex. 1, at ¶ 2], the Court concludes Famiglietta's later affidavits [Docs. 42-1 and 48, Ex. 1] conflict with her earlier deposition testimony in an impermissible attempt to create a sham issue of fact.

---

[2]ProCuts noted that Plaintiff's counsel requested the opportunity for Famiglietta to read and sign her deposition.  She made no substantive changes to her deposition testimony on any errata sheet. [Doc. 49, at 2 n.1.]

In the December 2012 deposition, defense counsel asked Famiglietta if she remembered Chris Sherman (a shop manager) telling her that she was not smiling enough at work. Famiglietta testified that she remembered this but did not recall how many times Sherman spoke to her about it. [Doc. 39-6, at 178.] In Famiglietta's June 2013 affidavit, she stated that "[a]t no time during my employment was I counseled by C. Sherman 'that it was important to smile and be friendly to the customers.'" [Doc. 42-1, at ¶ 12.] Famiglietta unpersuasively argues that the testimony is consistent with respect to whether she was "counseled" on this matter. [Doc. 48, at 4.] The Court finds that Famiglietta impermissibly attempted to create a sham issue of fact through her affidavit.

In the December 2012 deposition, counsel presented Famiglietta with her time records from October-December 2010. [Doc. 43-1, at 88.] She could not remember the hours she was scheduled for the dates in question and could not answer counsel's questions about timekeeping issues. For example, one time sheet noted 21 hours Famiglietta was scheduled to work when she did not work. [Doc. 43-1, at 90.] Famiglietta testified at the deposition she could not remember when she was or was not at work. [Id.] Famiglietta remembered, however, that she thought her pay was low on one occasion and asked about it. She recalled that she was shown hours on the computer but could not remember what exactly she saw on the computer. Famiglietta believed she thought her supervisor was incorrect about the hours she worked. Yet, she testified during the deposition that she did not know when she was there or not. She could not say one way or the other. [Doc. 43-1, at 90-92.] Defense counsel also asked Famiglietta if she had permission "all these times" to come in late to work or leave early. Famiglietta testified that she was "not saying that I had permission all of the time, but I did not leave early without asking, ever." [Doc. 43-1, at 95.] She was given permission to come in late "at times." [Id.]

7

In the June 2013 affidavit, Famiglietta's memory was clearer.  She asserted that ProCuts's UMF No. 14 was false when it stated she was regularly late to work.  Famiglietta testified in the affidavit that if "on occasion I was going to be late for work, I would call ahead and would provide notification and obtain permission . . . ."  She stated that "[t]he worksheets referenced . . . are misleading and do not accurately reflect the circumstance, notification, and permission provided." [Doc. 42-1, at ¶ 17.] Yet, she did not specify how the worksheets were inaccurate.

Famiglietta's deposition testimony about the worksheets was very vague, yet her affidavit testimony was much sharper– the worksheets were misleading.  Her belated affidavit cannot be used in this way, *i.e.,* to shore up vague testimony she gave at her deposition.  This is not the type of later permissible testimony used to clear up some earlier confusion.  The Court finds Famiglietta impermissibly attempted to create a sham issue of fact through the later affidavit.

In the December 2012 deposition, Famiglietta testified about several ProCuts employees having to do "re-dos" for clients after Famiglietta cut their hair and the clients were disappointed. Famiglietta recalled then that two employees had to do "re-dos"  "quite often." [Doc. 43-1, at 110-111.]  Famiglietta apparently did not believe these were complaints and requests for "re-dos," and considered complaints about "re-dos" as evidence of harassment by ProCuts. [Id., at 112.] In the June 2013 affidavit, Famiglietta testified that "[a]t no time during my employment, was I made aware of or told by the defendant of '. . . an increase in the number in the Plaintiff's customer[s] who returned to the shop seeking re-dos'." [Doc. 42-1, at ¶ 18.]  Famiglietta argues that she did not experience "any comments" about her "work performance" until after she informed ProCuts of her pregnancy, but her affidavit testimony about re-dos conflicts with her deposition testimony.  The later affidavit testimony is another impermissible attempt to create a sham issue of fact.

8

Famiglietta's self-serving argument that her testimony is consistent [Doc. 48, at 5] is unpersuasive and insufficient to create a disputed fact.

In the December 2012 deposition, Famiglietta implies that a problem at work concerning access to water negatively impacted her because of her pregnancy. She testified that she "was upset at the time . . . because I was pregnant and I wasn't able to go to the bathroom or wash my hands or anything. And we were just told that we had to go to Twisters, which is right behind us, the restaurant right behind us, if we needed to go to the bathroom or wash our hands . . . ." [Doc. 39-5, at 149.] When asked if this was harassment or discrimination towards her, Famiglietta was vague. She responded that she "just felt it wasn't right because I didn't have anywhere to go to the bathroom or wash my hands." [Id.] She admitted she could go to Twisters.

Famiglietta again relies on the June 2013 affidavit in an attempt to dispute UMF No. 26, that stated she contends she was treated unfairly due to her pregnancy in early January 2011, when the water was temporarily turned off in the shop and she and other employees had to go next door to use the bathroom. She testifies in the affidavit that UMF No. 26 is incorrect and misleading and that she was not discriminated against due to the water being turned off. However, she was discriminated against by not receiving the same treatment as coworkers "related to the same work related actions and activities," once she disclosed her pregnancy and complained to management. [Doc. 42-1, at ¶ 24.]

The affidavit testimony and deposition testimony may not be in direct conflict. Famiglietta implied that the water issue impacted her negatively in relation to her pregnancy and that she thought it "wasn't right," in reference to her own needs. She summarily argues that UMF No. 26 is incorrect and that she was discriminated against once she disclosed her pregnancy. The primary problem with ¶ 24 of her affidavit is that is does not create a genuine issue of fact with respect to

UMF No. 26.  It contains nothing more than conclusory, unsubstantiated argument that is insufficient to raise an issue of disputed fact.  *See* <u>Tran v. Sonic Indus. Servs., Inc.</u>, 490 F. App'x 115, 118 (10th Cir. July 19, 2012) (unpublished) (unsupported conclusory allegations do not create fact issues; to oppose summary judgment, plaintiffs "must do more than provide their subjective interpretation of the evidence, they must marshal admissible evidence of material facts") (citations omitted).  Moreover, the water shut-off at the salon impacted all employees who had to go use facilities next door.  It was not a policy directed only at pregnant employees.

There are numerous similar deficiencies with Famiglietta's June 2013 affidavit that do not all concern inconsistencies with prior sworn testimony.  These deficiencies relate to summary and self-serving contentions or denials by Famiglietta about her claims and her own work performance.  For example, she avers that she "fully and completely performed" her duties and responsibilities during her entire employment with ProCuts. [Doc. 42-1, at ¶ 3.] If it were sufficient to merely say I was discriminated against and I satisfactorily performed my job, summary judgment in an employment case would never be granted.  However, it is not that easy to create a genuine issue of material fact in dispute sufficient to defeat summary judgment.  *See, e.g.,* <u>Skrzypczak v. Roman Catholic Diocese of Tulsa</u>, 611 F.3d 1238, 1244 (10th Cir. 2010) (conclusory and self-serving affidavits are not sufficient to survive summary judgment) (citation omitted), *cert. denied.* 132 S.Ct. 1088 (2012); <u>Fitzgerald v. Corrs. Corp. of Am.</u>, 403 F.3d 1134, 1143 (10th Cir. 2005) (holding physician's affidavit was insufficient to support summary judgment because it contained only conclusory allegations without specific supporting facts); <u>Hook v. Regents of Univ. of California</u>, 394 F. App'x 522, 533 (10th Cir. Sep. 13, 2010) (unpublished) ("Of course, because '[c]onclusory statements in affidavits opposing a motion for summary judgment are not sufficient to raise a genuine issue of material fact,' we will disregard the conclusory allegations that appear in each

affidavit, such as [plaintiff's] frequent complaints that he was 'retaliated against,' and the ongoing comparisons he makes between his qualifications and those of other job applicants.") (internal citation omitted).

Here, Famiglietta's own evaluation of her job performance does not raise a genuine issue of material fact with respect to her employer's perception of her work. *See* Furr v. Seagate Tech., 82 F.3d 980, 988 (10th Cir. 1996) (manager's perception of the employee's performance is relevant, rather than the plaintiff's subjective evaluation of her own relative performance), *cert. denied*; 519 U.S. 1056 (1997); Lucero v. Sandia Corp., 495 F. App'x 903, 909-910 (10th Cir. Aug. 28, 2012) (unpublished) (a plaintiff's own opinion that his performance is excellent does not raise a fact question); Powell v. Laborers Union No. 1271, 426 F. App'x 615, 620 (10th Cir. June 7, 2011) (unpublished) (commonplace in employment law that the employer's perception of employee performance controls the pretext inquiry and can justify termination even if mistaken) (citation omitted).

The Court disregards all portions of the affidavit wherein Famiglietta provides self-serving opinions and speculation about her work. *See, e.g.,* [Doc. 42-1, at ¶ 3, ¶ 8 ("at no time did I exhibit a poor attitude and a lack of attention" "I fully and completely fulled [sic] my duties"); ¶ 9 ("at all times I performed my work employment duties as required"); ¶ 10 ("at all time [sic] I performed my employment duties as required"); ¶ 11 ("at all times during my employment . . . I engaged customers in a professional and cordial manner"); ¶¶ 13, 27, 31, 32, 33, 36 38 ("the statements made in paragraph [] of the Undisputed Facts are false"); ¶ 16 ("based upon my knowledge, there are [sic] no documentation which evidence that I ever left the shop without permission of my supervisor"); ¶ 34 (had ProCuts conducted a more thorough investigation, it would have discovered Famiglietta was treated unfairly); ¶ 40 (the incident never occurred).] If the evidence demonstrates otherwise,

11

Famiglietta's opinions of her work performance do not create disputed issues of fact and are disregarded.

In sum, the Court concludes that Famiglietta's June 2013 affidavit either is an improper attempt to create a sham issue of fact or is insufficient to raise a genuine issue of material fact to defeat summary judgment. The Court further observes that Plaintiff's counsel could have cross-examined and rehabilitated his client during the December 2012 deposition, but chose not to seek clarification. In addition, none of the purported evidence supplied in Famiglietta's June 2013 evidence is newly discovered evidence. The June 2013 affidavit does not attempt to clarify confusion in relation to the June 2012 deposition. For all of the above-stated reasons, the Court grants, in part, ProCuts's motion to strike Famiglietta's June 2013 affidavit. To the extent the Court did not strike the entire affidavit based on Plaintiff's impermissible attempt to create sham issues of fact, the Court disregards the remainder of the affidavit as it presents improper, self-serving testimony as explained above. The effect of this ruling is that Famiglietta failed to dispute almost all of the UMFs set forth by ProCuts because she relies almost exclusively on her affidavit for purposes of trying to create disputed material facts.

B.     Undisputed Material Facts

Famiglietta expressly states she does not dispute UMF Nos. 1-4, 20, 22-25, 27-30, 32, 34-35, 37-41, 45, 48-57, 59-62, 64, 68, 70-73, 75-87. [Doc. 42, at 1-6.] All of these undisputed facts are supported by admissible evidence. There is little need to discuss each and every of the 87 proposed UMFs; therefore, the Court summarizes the critical undisputed facts in relation to the claims.

ProCuts is a franchise owned by K-Bear, LLC. Miguel Sherman and Kathy Sherman are each part owners. In November 2009, ProCuts hired Famiglietta as a hair stylist. During Famiglietta's employment, Chris Sherman was general manager of ProCuts. Gina Clark ("Clark")

served as Shop Manager and Famiglietta's direct supervisor during most of Plaintiff's employment. [UMF Nos. 1-4.]

In mid to late December 2010, Famiglietta advised ProCuts's management that she was pregnant. Famiglietta provided one doctor's note, dated December 28, 2010, to ProCuts regarding her pregnancy. [UMF No. 20.]

In late December 2010, Chris Sherman and Clark wrote up Famiglietta for job performance deficiencies, including her frequent tardiness and failure to work scheduled hours, along with the customer complaints about Famiglietta. The write-up initially imposed a 60-day probationary period for Famiglietta to remedy the stated issues. Later, management rescinded the probationary period as it found that other employees did not adhere to schedules. In addition, subsequent to an investigation in 2011, ProCuts elected to remove the disciplinary write-up from Famiglietta's file. Famiglietta objected to the write-up and discipline, but notwithstanding her disagreement, it remains undisputed that as of December 28, 2010, Famiglietta was counseled and warned that future performance problems could lead to termination. [UMF Nos. 22-25, 38-41, 57.]

Famiglietta alleged that the write-up and imposition of discipline were evidence of harassment and pregnancy discrimination. Yet, it appears that the only basis for that allegation is the timing of the discipline, *i.e.,* that it occurred sometime subsequent to Famiglietta's announcement that she was pregnant.

Famiglietta also contended that Clark harassed her in early January 2011, by stating to Chris Sherman that Famiglietta came to work "hung over." It is undisputed Famiglietta began using marijuana and cocaine in about May 2010, but she alleged that she never used drugs at work. However, Famiglietta fails to provide any admissible evidence to rebut the fact that in the summer of 2010, management was informed that Famiglietta frequently appeared angry, came to work

looking sloppy and unkempt, and that a coworker observed that she developed an unfriendly demeanor after June/July 2010. Famiglietta's contention that she never exhibited a poor attitude and fully completed her job duties throughout her employment fails to dispute UMF No. 7.

It is undisputed that Famiglietta's father appeared at the ProCuts's shop in the first half of January 2011, and demanded to speak to Chris Sherman in a threatening way. The undisputed facts demonstrate that Famiglietta's father was unable to speak to Chris Sherman that day but told his daughter at the shop to let him know if she had any more problems with Chris Sherman. Miguel Sherman reported the incident to the police out of concern with Famiglietta's father's behavior in the shop. [UMF Nos. 29, 48.]

It is undisputed that on January 12, 2011, ProCuts received two customer complaints about Famiglietta. [UMF No. 30.] One customer was Jamie Broughton, who supplied an affidavit, discussing having brought her grandsons to ProCuts for haircuts and that someone described as Famiglietta gave the haircut. Ms. Broughton noted Famiglietta had an "attitude with a mad look on her face."[3] Famiglietta did not speak to the grandson about his hair and never smiled. She gave him a "short buzz cut to his whole head and took off his bangs that were to be scissor-cut." According to Broughton, Famiglietta never apologized and never spoke at all. She merely collected the money. Broughton complained to manager Clark the next time she came in. The store owner called Broughton to apologize in response to the complaint. ProCuts documented Boughton's complaint in writing. [UMF No. 32.]

---

[3]Famiglietta unpersuasively attempted to dispute a portion of UMF 31, by summarily stating she did not have a "made [sic] look" nor did she "buzzed" [sic] off" Boughton's grandson's bangs. [Doc. 42-1, at ¶ 25.] Famiglietta's self-serving affidavit does not dispute Boughton's complaint that is documented in an affidavit and in the write-up of the complaint. Moreover, she cannot and does not dispute that the complaint was made.

ProCuts documented another customer's complaint on January 12, 2011, wherein the client stated that Famiglietta gave her a "fade" and "dug in so bad that [the client] flinched in pain."  Upon looking at the haircut at home, the customer noticed that Famiglietta missed cutting some long hairs and that the fade was crooked.  The customer described Famiglietta as "Moody Molly."  ProCuts's management apologized and gave a discount to the customer to make up for Famiglietta's work and poor behavior.  [UMF No. 33.]

Famiglietta disputes the substance of these two complaints and denies any problem with these two clients.  However, it is undisputed that ProCuts received and documented these complaints from two customers in January 2011 about Famiglietta's work performance and behavior.

Famiglietta also admits that Saxxon Rakes, another coworker who provided a sworn declaration, stated that Famiglietta's attitude and customer service seemed to further worsen in January 2011, when there were even more complaints about Famiglietta's work.  Stylist Aaron Coleman also gave deposition and affidavit testimony that at least ten customers informed him that Famiglietta had been rude to them or had rushed through her work. [UMF Nos. 34, 35.]  Again, Famiglietta argues that she performed her work employment duties as required at all times and was cordial and professional; however, she does not and cannot dispute coworkers' testimony that there numerous client complaints and problems with Famiglietta's work and attitude.

Famiglietta does not dispute that Miguel Sherman came to ProCuts on January 15, 2011 to discuss her job performance, advise her that her job was in jeopardy due to continuing misconduct, and to address her father's disruptive behavior in the store.  It is undisputed that Miguel Sherman began discussing these issues with Famiglietta with Clark present.  Famiglietta interrupted and alleged Clark was harassing her.  Thus, Sherman had Clark step outside and asked Famiglietta to describe any harassing conduct.  Famiglietta complained about the December 28, 2010 write-up.

[UMF Nos. 39-41.]  When asked for any other instances of misconduct by Clark, Famiglietta stated Clark was a poor manager, dealt illegal drugs in the shop and attempted to poison another employee's food.  Famiglietta also complained that she (Famiglietta) was not liked by the "clique" in the shop. [UMF No. 42.]

Famiglietta does not dispute that these were her complaints.  However, she states she also informed Miguel Sherman that she felt she was being discriminated against, "in part, due to my pregnancy."  In addition, she contends that Miguel Sherman lectured her in a threatening manner and did not allow her to speak and address all of her concerns.  Famiglietta alleged that Clark discriminated against her by cutting her hours for the first few weeks in January.

It is undisputed that upon receipt of Famiglietta's complaints, Miguel Sherman conducted an investigation, although Famiglietta argues the investigation was not thorough.  Famiglietta does not contest that Miguel Sherman and the bookkeeper met with her outside the store and invited her to provide any additional information about her allegations.  Famiglietta was offered paid leave during the investigation.  It is undisputed that during the investigation, Clark was temporarily transferred to another location, allowing Famiglietta to return to work. [UMF Nos. 48-51.]

Famiglietta does not challenge the undisputed fact that Miguel Sherman informed her on January 19, 2011, that poor customer service would not be tolerated.  It is undisputed that Miguel Sherman interviewed all other stylists at the shop and interpreted two stylists' comments to indicate Famiglietta's behavior and attitude were hurting the business. [UMF No. 52.]

Famiglietta concedes that another stylist informed Miguel Sherman that there were customer complaints about Famiglietta's attitude and told Sherman that Famiglietta was "killing the business." It is uncontested that another stylist testified that everyone at the shop was supportive of Famiglietta's pregnancy. [UMF Nos. 53, 54.]

16

Famiglietta agrees that Miguel Sherman did not uncover any evidence to support her claims that Clark was harassing her due to her pregnancy.  Famiglietta did not contest that, during his investigation, Miguel Sherman found that customers raised legitimate complaints about her in January 2011, as well as 2010, but that ProCuts did not adequately document the 2010 complaints. [UMF No. 56.]

It is undisputed that Miguel Sherman met with Famiglietta on January 27, 2011, to inform her of the conclusions of his investigation.  Miguel Sherman told Famiglietta that while he was expunging the December 28, 2010 write-up from her file because there was evidence that other stylists did no adhere to the schedule, the recent customer complaints would remain in her file. Famiglietta does not dispute that Miguel Sherman informed her on this date that she was to maintain a good attitude and good customer service and that she could not receive additional serious complaints.  [UMF No. 57.]

Famiglietta believed ProCuts took her complaints seriously and listened to her complaints. She admitted that nothing more could have been done in terms of the investigation into her complaints.  This is another example when Famiglietta attempted to dispute her deposition testimony with the later affidavit.  In the December 2012 deposition, when asked if she had every opportunity that she might have needed to make sure Miguel Sherman knew about all of her concerns, Famiglietta responded: "Based on the time and what I was able to give him, yes, I think that I told him everything that I could have thought of at the time."  She further testified that she did not think Sherman cut her off and that she thought he listened to what she said.  Famiglietta then testified that she was "not sure if there was anything that they could do more" in terms of the investigation into her concerns of harassment. [Doc. 39-6, at 170-71.]

Notwithstanding this clear testimony, Famiglietta's affidavit statement is to the contrary. She testifies that ProCuts should have taken her complaints and concerns more seriously, should have conducted a "through [sic] investigation," and would have discovered many of the alleged complaints against her were not "related to services which I provided."  She also asserts in her affidavit, contrary to the deposition testimony, that a more thorough investigation would have revealed she was being treated unfairly by management and that improper and disparaging statements were made, relating to her pregnancy. [Doc. 42-1, ¶ 34.] This is improper and an impermissible attempt to create a sham issue of fact via later affidavit testimony that is contrary to earlier sworn deposition testimony.  Famiglietta did not raise a genuine issue of fact concerning the extent of ProCuts's investigation and the results of the investigation.

Famiglietta also fails to dispute that ProCuts received a number of other customer complaints about her work and attitude in January 2011. [UMF Nos. 60-61.] She agrees that Miguel Sherman determined problems continued at the shop and held an all-staff meeting on February 12, 2011, during which staff, including Famiglietta, were instructed that termination could occur on the spot in the event of a serious customer complaint, excessive tardiness, or other significant misconduct. [UMF No. 62.]

Famiglietta contests the substance of yet another customer complaint made about her on February 24, 2011, but she does not dispute that a coworker felt so bothered by the incident that she reported it to Clark and memorialized it in writing.  More customer complaints were made to management about Famiglietta in late February and early March 2011.  Famiglietta again does not dispute that the complaints were made, but she argues she did not engage in the conduct that prompted the complaints. [UMF Nos. 65, 66; Doc. 42-1, at ¶¶ 36, 37, 38, 39.] Similarly, Famiglietta

18

does not dispute that a coworker informed Kathy Sherman about a customer incident involving Famiglietta's work performance and complaint on February 24, 2011. [UMF No. 68.]

Moreover, Famiglietta agrees that Kathy Sherman called the shop to speak to Famiglietta about the customer complaint and that Famiglietta began to cry, informed Sherman she could not stay to talk or work, and was permitted to leave work.  It is uncontested that Famiglietta contends Sherman subjected her to harassment on the telephone when she told Famiglietta to stop crying and act like an adult.

In addition, it is undisputed that Kathy Sherman learned from Clark and a coworker that Famiglietta had a history of customer complaints and recently displayed a poor attitude at work. Another stylist informed Kathy Sherman that Famiglietta went to the bathroom to use her cell phone in violation of store policy and that she failed to complete duties around the shop. [UMF No. 73.] Famiglietta does not challenge the fact that Kathy Sherman contacted a customer to confirm that customer's complaint about Famiglietta [UMF No. 74], but Famiglietta states she was not the person about whom the complaint was made, notwithstanding evidence to the contrary.

Finally, Famiglietta does not contest UMF Nos. 75-87 which address the termination decision.  For example, it is undisputed that Kathy Sherman considered rudeness to a client to constitute serious misconduct and that Sherman believed Famiglietta exhibited such rudeness. Kathy Sherman reviewed the 2011 investigation and was aware of a pattern and trend of "really serious happenings" by Famiglietta that took place before and after the February 12, 2011 staff meeting.  Kathy Sherman knew that Famiglietta previously was warned about improper behavior in the workplace and concluded that Famiglietta was not going to change.  Perhaps most importantly, Famiglietta does not dispute that Kathy Sherman decided to terminate Famiglietta's employment on March 8, 2011 "for the customer service performance issues." [UMF No. 80.]

Moreover, Famiglietta did not contest that there were two recent complaints about her at the time of termination.

C.    Famiglietta's Proposed UMFs

The Court briefly addresses Famiglietta's proposed UMFs. [Doc. 42, UMFs 1-16.] She states, for example, that Clark did not like her and "engaged in negative workplace behavior" towards Famiglietta.  It does not matter if Clark liked Famiglietta or even if Clark acted "negatively" towards Famiglietta.  The question is whether there is evidence of discriminatory conduct by Clark based on Famiglietta's protected status.  Famiglietta's UMF No.1 is not evidence of unlawful harassment or discrimination.

Famiglietta also asserts that after she told ProCuts she was pregnant, Clark stated to other staff that she wished Famiglietta would quit and that Clark was tired of her.  Famiglietta relies on deposition testimony by another employee for this proposition.  However, in examining that employee's testimony, he did not say that Clark made such comments somehow in relation to Famiglietta's pregnancy.  That is simply Famiglietta's unsupported conjecture.  More importantly, it is undisputed that Clark did not make the decision to terminate Famiglietta. [UMF Nos. 70-80.]

Famiglietta refers to a coworker's supposed testimony that he or another coworker believed Famiglietta was singled out regarding her work schedule. [UMF Nos. 3-4.]  Even if Famiglietta was singled out about her work schedule, it is undisputed that the write-up concerning that matter was expunged after an investigation.  In addition, the testimony Famiglietta relies on does not demonstrate that she was "singled out" in relation to her complaints of discrimination.  Moreover, the reasons for Kathy Sherman's termination decision are undisputed and relate to customer service performance issues.

Famiglietta also proposes a number of facts concerning a "black book" used to record negative customer comments about her work. Even if true, however, it is not evidence that complaints or documentation of complaints were made due to Famiglietta's pregnancy. An employer is entitled to assess and evaluate an employee's performance and to document problems. Famiglietta speculates that because of her complaints of discrimination, the black book was used to "solicit and log complaints against" her. The facts are undisputed, however, with respect to the reasons for Kathy Sherman's termination decision.

It is not necessary for the Court to explain why each and every one of Famiglietta's proposed undisputed facts fail to raise a genuine issue of fact. Many of them are duplicative and incomplete, or taken out of context. The majority of Famiglietta's proposed facts rely on one coworker's testimony. Even if the coworker sometimes testified favorably about Famiglietta's work performance, his assessment of Famiglietta's work performance and attitude is not relevant or determinative of work performance. Instead, management's perception of an employee's conduct and work performance is controlling.

IV.   DISCUSSION

    A.   Dismissal of Jane Does 1-5

Famiglietta did not identify or effect service on Jane Does 1-5. Rule 4(m) requires that service be effected on a defendant within a 120-day period. It states: "If a defendant is not served within 120 days after the complaint is filed, the court – on motion or on its own after notice to the plaintiff – *must* dismiss the action without prejudice against that defendant . . . ." Fed. R. Civ. P. 4(m) (emphasis added).

21

Famiglietta argues that the Court has discretion regarding dismissal of the unidentified and unserved Defendants. [Doc. 42, at 8.] She also asserts there is no prejudice to Defendants to allow the lawsuit to proceed against the unnamed Defendants.

The preliminary inquiry to be made under Rule 4(m) is whether Famiglietta showed good cause for failing to timely effect service on the Jane Doe Defendants. Espinoza v. United States, 52 F.3d 838, 841 (10th Cir. 1995). "If good cause is shown, the plaintiff is entitled to a mandatory extension of time [to effect service]. If the plaintiff fails to show good cause, the district court must still consider whether a permissive extension of time may be warranted." Id.

Famiglietta had adequate time from the filing of her Complaint over a year ago, in June 2012, to identify any Jane Doe Defendants and to effect service on them. She failed to do so. The Court dismisses the Jane Does Defendants.

B.     Hostile Work Environment Claim

To prove a Title VII violation, a plaintiff must demonstrate "discrimination based on sex has created a hostile or abusive work environment." E.E.O.C. v. PVNF, L.L.C., 487 F.3d 790, 798 (10th Cir. 2007) (quotation omitted). In considering whether Famiglietta set forth evidence of a sexually hostile work environment sufficient to survive summary judgment, the Court examines "the totality of the circumstances ..., which is the touchstone of [the court's] analysis" of such claims. Id. at 799 (quotation omitted); see also Harsco Corp. v. Renner, 475 F.3d 1179, 1187 (10th Cir. 2007).

In Harsco, the Tenth Circuit set out the following elements required for a hostile work environment claim based on gender/pregnancy: "(1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment." Id., 475 F.3d at 1186 (citation

22

omitted).  Thus, Famiglietta had to show a rational factfinder could find that ProCuts was permeated with "discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and that Famiglietta was "targeted for harassment" because of gender/pregnancy.  Herrera v. Lufkin Indus., Inc., 474 F.3d 675, 680 (10th Cir. 2007) (quotation omitted).

For purposes of a hostile work environment claim, it is not sufficient to identify a few isolated incidents of gender-based enmity or sporadic gender-based slurs.  Instead, the plaintiff must demonstrate that there was a steady barrage of opprobrious gender-based comments.  Semsroth v. City of Wichita, 304 F. App'x 707, 711 (10th Cir. Dec. 22, 2008) (unpublished) (citations omitted); see also Bolden v. PRC Inc., 43 F.3d 545, 551 (10th Cir. 1994) (no evidence of steady barrage of race-based comments; while clear from the record that plaintiff was unhappy at work, general torment and taunting, if not racially discriminatory, are not actionable), cert. denied, 516 U.S. 826 (1995).  The Court looks at the work atmosphere both objectively and subjectively, examining all the circumstances from the perspective of a reasonable person in the plaintiff's position.  Semsroth, 304 F. App'x at 711. (citations omitted.)

While Tenth Circuit precedent underscores that, generally speaking, the severity and pervasiveness evaluation is unsuited for summary judgment due to quintessential questions of fact, McCowan v. All Star Maint., Inc., 273 F.3d 917, 923 (10th Cir. 2001), this case does not present even a close call.  For example, there is no evidence of pregnancy-related slurs or epithets. Compare Zisumbo v. McCleodUSA Telecomms. Servs., Inc., 154 F. App'x 715, 726 (10th Cir. Nov. 23, 2005) (unpublished) (shortly after informing direct supervisor of pregnancy, supervisor came to plaintiff's office stating her new name would be "prego" and the supervisor referred to her as "prego" 75% of

the time for a 3-month period; supervisor also yelled at the plaintiff and suggested she quit or go on disability if she could not handle the stress of job because of pregnancy).

In her response brief, Famiglietta's argument does not address the required elements of the claim.  Instead, she summarily asserts that disputed issues of fact exist relating to alleged wrongful conduct of ProCuts.  [Doc. 42, at 9.]  She provides nothing more than insufficient conclusory argument that ProCuts's UMFs minimized its wrongful behavior and that it "engaged in a protracted pattern of discriminatory behavior."  [Id.]  The facts, if not most allegations, are to the contrary.

Famiglietta's meager evidence of supposed harassment relates to the disciplinary write-up on December 28, 2011, that was expunged from her file after an investigation.  Famiglietta, like every employee, temporarily had no access to water and had to use water at a nearby store.  A supervisor observed that Famiglietta came to work appearing "hung over."  The same supervisor made negative comments about Famiglietta's work, attitude or appearance, but made similar comments about other stylists.  The supervisor cut Famiglietta's work hours for several weeks in January 2011.  Famiglietta had to move her workstation next to her supervisor at one point.  Another supervisor attempted to speak to Famiglietta about customer complaints but had to allow Famiglietta to go home instead.  That supervisor told Famiglietta on the phone to stop crying and act like an adult.  A black book was used to document complaints about Famiglietta.  Customers complained about Famiglietta.

None of these allegations have any clear connection to Famiglietta's pregnancy.  There is no evidence or inference that any of the alleged conduct occurred because of Famiglietta's pregnancy.  Moreover, in viewing the totality of the circumstances, the conduct at issue was isolated in nature and nowhere near "a steady barrage of opprobrious [discriminatory]" comments or an

atmosphere riddled with pervasive and severe ridicule sufficient to create a hostile work environment.

Famiglietta failed to raise a genuine issue of fact with respect to the hostile work environment claim.  She did not present genuine issues of fact regarding whether she was subjected to unlawful and sufficiently severe unwelcome harassment, nor did she demonstrate disputed facts that the alleged harassment was based on sex or pregnancy.  Plaintiff's allegations of unpleasant interactions at work with coworkers or customers do not demonstrate the level of severity required to establish a hostile workplace claim.  For example, unpleasant or negative interactions with a coworker are "ordinary tribulations" that are inherent when different personalities interact in an employment context.  *See, e.g.,* Falk v. City of Glendale, 2012 WL 2390556, at *4 (D. Colo. June 25, 2012) (unpublished) (citation omitted).  Finally, there are no genuine issues in dispute with respect to whether a term, condition, or privilege of Famiglietta's employment was altered due to the purported harassment's severity or pervasiveness.  Thus, the hostile work environment claim must be dismissed, with prejudice.

C.   Pregnancy Discrimination Claim under Title VII or New Mexico Human Rights Act ("HRA")[4]

"The Pregnancy Discrimination Act does not require any affirmative accommodations; it simply prohibits employers from treating pregnancy-related conditions 'less favorably than other medical conditions.'"  Borwick v. T-Mobile West Corp., 2013 WL 229497, at *7 (D. Colo. Jan. 22, 2013) (unpublished) (citations omitted).

_____

[4]The McDonnell Douglas burden-shifting framework is used whether examining the Title VII claim of the HRA claim.  Orr v. City of Albuquerque, 531 F.3d 1210, 1214 n.2 (10th Cir. 2008).  Thus, a decision that Famiglietta failed to survive summary judgment as to the Title VII claim means the HRA claim fails as well.

> A plaintiff alleging pregnancy discrimination must show that she was treated differently than other coworkers who were not pregnant.  See id. (*citing* Khalik v. United Air Lines, 671 F.3d 1188, 1193 (10th Cir. 2012).  A pregnancy discrimination claim is examined under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Atchley v. Nordam Group, Inc., 180 F.3d 1143, 1148-49 (10th Cir. 1999).  The first stage requires [the plaintiff] to show a prima facie case of discrimination.  Id. This means showing that "(1) she is within the protected class; (2) she was doing satisfactory work; (3) she was discharged; and (4) her position remained open and was ultimately filled by a nonpregnant employee."  Id. at 1148.

Id.

If Famiglietta succeeds in establishing a *prima facie* case of pregnancy discrimination, *i.e.,* by providing evidence of the four required elements discussed above, then the burden shifts to ProCuts to set forth a legitimate, non-discriminatory reason for the challenged employment action. *See* id.  If ProCuts provides such a reason, the burden returns to Famiglietta to show that there is a genuine dispute of material fact as to whether ProCuts's proffered reason for the termination decision was pretextual or " unworthy of belief."  Annett v. Univ. of Kan., 371 F.3d 1233, 1240 (10th Cir. 2004).

"Pretext exists when an employer does not honestly represent its reasons for terminating an employee."  Borwick, at *8 (*citing* Miller v. Eby Realty Group LLC, 396 F.3d 1105, 1111 (10th Cir. 2005)).  "A plaintiff demonstrates pretext by producing evidence of 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  Id. (citations omitted).  If Famiglietta shows pretext, she survives summary judgment and need not

present direct evidence that pregnancy was the actual reason for her termination.  Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir.1995).

Again, in her response, Famiglietta presents no argument or evidence to support the elements required for a *prima facie* case of pregnancy discrimination.  She argues only that she "has put at issue put at issue [sic] and presented a prima facie showing that summary judgment as to the Title VII Claim is inappropriate and should be denied." [Doc. 42, at 10.] She claims summarily that the termination decision was "not legitimate, nor nondiscriminatory."  She identifies no evidence of pretext, nor does she mention pretext.

Famiglietta did not raise a genuine issue of fact with respect to whether she was satisfactorily performing her job.  The undisputed evidence demonstrates that she had multiple serious problems at work, both with her behavior towards customers and the quality of her work.  It is uncontested that ProCuts was not satisfied with Famiglietta's work performance even though it gave her multiple opportunities to improve before terminating her.  To the extent that Famiglietta was required to show another person filled her position who was not pregnant, she did not present evidence as to her replacement.

However, even if the Court determines for purposes of deciding the summary judgment motion that Famiglietta satisfied the *prima facie* elements of a pregnancy discrimination claim, she did not demonstrate that ProCuts's reasons for the termination were pretextual or unworthy of belief. ProCuts provided undisputed evidence that it terminated Famiglietta because of dissatisfaction with her work and repeated customer complaints.

While Famiglietta disagrees with ProCuts's reasons for terminating her, she did not present any evidence to show ProCut's explanations were weak, implausible, inconsistent, incoherent, or contradictory.  In addition, even if Famiglietta is believed that she never was counseled about work

deficiencies, the key question is whether ProCuts acted with discriminatory intent in terminating her. *See* <u>Smith v. Oklahoma ex rel. Tulsa County Dist. Attorney</u>, 245 F. App'x 807, 814 (10th Cir. Aug. 23, 2007) (unpublished) (in evaluating evidence of pretext, the court does not ask "whether the employer's proffered reasons were wise, fair or correct, but whether [he or she] honestly believed those reasons and acted in good faith upon those beliefs.") (citation, quotation and alterations omitted).

Here, the undisputed facts show that Kathy Sherman learned of customer complaints about Famiglietta after Famiglietta was advised she, as well as any employee, could be terminated for serious misconduct. It is uncontested that Sherman learned from Famiglietta's coworkers that she had a history of customer complaints and recently displayed a poor attitude at work. Kathy Sherman testified that she considered rudeness to a client to be serious misconduct and believed Famiglietta's conduct towards a complaining customer warranted termination. Based on her investigation, Sherman also testified that she was convinced Famiglietta committed the reported offenses about which recent customers complained. Kathy Sherman reviewed previous notes by Miguel Sherman during his 2011 investigation that showed Famiglietta had serious behavior or performance problems. She understood Miguel Sherman warned Famiglietta earlier about customer issues but that Famiglietta continued to engage in inappropriate conduct with customers. As a result, Kathy Sherman decided to terminate Famiglietta for customer service performance issues. Moreover, Famiglietta did not dispute there were two recent customer complaints at the time of her termination. Famiglietta's disagreement with Kathy Sherman's decision does not contradict Sherman's good-faith belief that Famiglietta's performance and behavior problems justified termination in March 2011. *See, e.g.,* <u>Furr</u>, 82 F.3d at 988 ("[i]t is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance");

*see also* E.E.O.C. v. Total Sys. Servs., Inc., 221 F.3d 1171, 1176 (11th Cir. 2000) (observing that an employer is entitled to rely on good-faith beliefs about employee misconduct); Tatum v. Philip Morris Inc., 809 F. Supp. 1452, 1462 (W.D. Okla. 1992) (even if employer is mistaken about theft by employee, the employer held a reasonable belief), *aff'd,* --- F. App'x ----, 16 F.3d 417 (Table, Text in Westlaw) (10th Cir. Dec 14, 1993).  Therefore, even allowing Famiglietta the benefit of the doubt that she established a *prima facie* case of pregnancy discrimination, she did not satisfy her burden in demonstrating pretext or in raising genuine issues of material fact regarding ProCut's articulated non-discriminatory reasons for the termination decision.  Accordingly, both the Title VII and HRA claims of pregnancy discrimination must be dismissed, with prejudice.

   D. Retaliation/Retaliatory Discharge Claim

   Famiglietta alleges that her termination resulted from her complaints of "discriminatory practices" at ProCuts. [Doc. 1-1, at 8.] The Court found that Famiglietta did not raise a genuine issue of material fact with respect to any alleged discriminatory conduct on the part of ProCuts.  Thus, any retaliation claim based on alleged discrimination necessarily fails.

   If Famiglietta intended to bring a retaliation claim under Title VII, she had to plead and prove: (1) that she opposed some form of discrimination prohibited by Title VII, (2) that she was subject to adverse employment action, and (3) that a causal connection existed between the opposition and the adverse action.  *See* Khalik, 671 F.3d at 1193.  Again, Famiglietta failed to raise a genuine issue of material fact concerning discriminatory actions by ProCuts.

   Even if she satisfied a *prima facie* case of Title VII retaliation, once ProCuts presented a legitimate, non-retaliatory reason for the termination, Famiglietta had to demonstrate that the stated reason was a pretext for unlawful retaliation.  *See* Bausman v. Interstate Brands Corp., 252 F.3d 1111, 1116 (10th Cir. 2001) ("Because an employer rarely announces retaliation as its motive for

terminating an employee, '[o]ur Supreme Court has adopted a burden-shifting approach to analyze cases involving retaliatory discharge based on discrimination") (applying Kansas state law); *see also* Stover v. Martinez, 382 F.3d 1064, 1070 (10th Cir. 2004) (discussing McDonnell Douglas burden-shifting framework and that the plaintiff must show that the employer's stated reason for the adverse employment decision is a pretext for unlawful retaliation). Famiglietta, as discussed *supra*, failed to show evidence of pretext.

ProCuts observes that to establish retaliatory discharge under New Mexico common law, Famiglietta must demonstrate, *inter alia*, that she was discharged because she performed an act that public policy would encourage. [Doc. 39, at 27.] The claims' elements include: (1) protected activity; (2) adverse action; and (3) a causal connection between the protected activity and adverse action.

Famiglietta did not come forward with evidence raising a genuine issue of fact as to the element of causal connection between the termination decision in March 2011 and her report to ProCuts that she was pregnant in December 2010. The mere report of pregnancy and subsequent complaints and problems with her performance and behavior at work do not raise a genuine issue of material fact with respect to causal connection. Even assuming six weeks constitutes a close temporal period (between Famiglietta's January 15, 2011 complaint to Miguel Sherman about Clark and Kathy Sherman's March 2011 termination decision), Famiglietta raises no genuine issues of fact concerning retaliatory motive on the part of Kathy Sherman. Indeed, Kathy Sherman's motives in terminating Famiglietta are uncontested – she terminated Famiglietta for poor customer service in the wake of previous warnings and documented problems.

Even if Famiglietta could meet the *prima facie* requirements of a retaliatory discharge claim, she still must present evidence of ProCuts's unlawful retaliatory motive. She failed to do so. *See*

Sanchez v. Mora-San Miguel Electric Co-op. Inc., 173 F.3d 864 (Table, Text in Westlaw), 1999 WL 176151, at *3 (10th Cir. Mar. 31, 1999) (applying New Mexico law) (unpublished) (jury instruction accurate that stated if plaintiff established a *prima facie* case of HRA retaliation, the defendant must articulate a legitimate non-retaliatory reason for the adverse action).   In other words, McDonnell Douglas, most likely, applies to examining a retaliatory discharge claim, and Famiglietta did not present evidence of pretext.

Famiglietta's briefing on the claim is conclusory and unpersuasive.  She argues that once she informed ProCuts of her pregnancy in December 2010, "defendant almost immediately" began to single her out for discipline.  The undisputed facts demonstrate otherwise.  She received a disciplinary write-up that was expunged.  Moreover, she argues inconsistently that ProCuts either singled her out for discipline frequently or never counseled her at all regarding problems with her work.  Famiglietta further asserts in a confusing vein: "The defendant's contention that the plaintiff is unable to present evidence that the plaintiff is unable to demonstrate that her termination was the result of her complaint to her employer, is factually incorrect." [Doc. 42, at 10.] The argument is confusing, self-serving, and not grounded in fact.

The Court concludes that Famiglietta failed to raise genuine issues of fact with respect to a retaliation or retaliatory discharge claim, and that it must be dismissed with prejudice.

E.      Intentional Infliction of Emotional Distress Claim ("IIED")

To succeed on a claim for IIED, Famiglietta must establish that: (1) defendant's conduct was extreme and outrageous under the circumstances; (2) the conduct in question was intentional and reckless; and (3) the plaintiff suffered extreme emotional distress as a result of the conduct.  Deflon v. Sawyers, 2006-NMSC-025, ¶ 26, 139 N.M. 637.  "Extreme and outrageous" conduct is defined as being "so outrageous in character and beyond the bounds of decency to be regarded as 'atrocious

and utterly intolerable in civilized society.'" <u>Stieber v. Journal Pub. Co.</u>, 120 N.M. 270, 274, *cert,*

*denied*, 120 N.M. 68 (1995).  The New Mexico Supreme Court previously recognized that "only in

extreme circumstances," will an act of terminating an employee support a claim of IIED.  <u>Trujillo</u>

<u>v. Rio Arriba Elec. Coop.</u>, 2002-NMSC-004, ¶ 27, 131 N.M. 607 (citation omitted).

ProCuts argues that Famiglietta fails to state a claim as to IIED.  Famiglietta argues, without

more, that the conduct alleged was extreme and outrageous under the circumstances.  It is unclear

what specific conduct Famiglietta could possibly identify that was so atrocious it could not be

tolerated in civilized society.

The Court concludes that even if Famiglietta could state a claim for IIED under Rule

12(b)(6) standards, which is doubtful, she did not raise a genuine issue of fact under Rule 56 with

respect to the required elements of the claim.  Therefore, the IIED claim must be dismissed, with

prejudice.

### Conclusion

The Court grants, in part, ProCuts's Motion to Strike Famiglietta's affidavit on grounds that

it impermissibly attempts to create sham issues of fact.  To the extent that certain portions of the

affidavit are not stricken, the Court disregards the entirety of the affidavit for the reasons stated

*supra*.

The Court grants ProCuts's Motion for Summary Judgment, with the result that the Jane Doe

Defendants are dismissed and that Plaintiff's Complaint and all claims are dismissed, with prejudice.

*Lorenzo F. Garcia*
Lorenzo F. Garcia
United States Magistrate Judge